Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 24, 2003        Decided July 18, 2003

No. 02-5374

ELOUISE PEPION COBELL, ET AL.,
APPELLEES

v.

GALE A. NORTON, SECRETARY OF THE INTERIOR, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 96cv01285)

———

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Gregory G. Katsas*, Deputy Assistant Attorney General, *Robert E. Kopp*, Director, *Thomas M. Bondy* and *Charles W. Scarborough*, Attorneys, *Roscoe C. Howard, Jr.*, U.S. Attorney, *Mark E. Nagle* and *R. Craig Lawrence*, Assistant U.S. Attorneys. *B. Michael Rauh* entered an appearance.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Elliott H. Levitas* argued the cause for appellees. With him on the brief were *Dennis M. Gingold* and *Keith M. Harper*. *George W. Austin* entered an appearance.

Before: GINSBURG, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Beneficiaries of Individual Indian Money trust accounts, as a class, sued the Secretary of the Interior and other federal officials, in their official capacities, for breach of fiduciary duty in the management of those accounts. In an earlier appeal, we affirmed the district court's holding that the officials, who serve as trustee-delegates for the federal government, had breached their fiduciary duties, and we remanded the case to that court for further proceedings. *Cobell v. Norton*, 240 F.3d 1081 (2001) ("*Cobell VI*").

In April 2001, with the consent of the parties, the district court appointed Joseph S. Kieffer III as "Court Monitor" and charged him to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings with the Court." In April 2002 the court reappointed Kieffer as Court Monitor, this time over the defendants' objection. On September 17, 2002, the court held Gale A. Norton, Secretary of the Interior, and Neal A. McCaleb, Assistant Secretary of the Interior for Indian Affairs, in contempt of court, elevated Kieffer to the status of "Special Master-Monitor," and scheduled further proceedings. The Department contends that in so doing the district court not only erred, it took control of functions constitutionally reserved to the Executive Branch. We agree that the district court erred, and we reverse Kieffer's reappointment and the citations for contempt. We lack jurisdiction, however, to consider the Department's contention that the court has overstepped its authority.

## I.  Background

We recounted the long history of the Government's trust responsibilities to Native Americans in *Cobell VI*, and we

therefore provide only an abbreviated version of that history here. Pursuant to the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (formerly codified at 25 U.S.C. § 331 et seq.), lands that had previously been set aside for Indian tribes were allotted to individual Indians in fixed amounts; "surplus" lands were opened to non-Indian settlement. The Act created a system in which allotted lands would be held in trust by the United States for 25 years or more, during which period an individual account ("Individual Indian Money" account or "IIM" account) would be created for each Indian with an interest in the allotted lands. The United States would manage the lands for the benefit of the allottees until the expiration of the trust period, at which time each allottee would be issued a fee patent. The Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.), ended the practice of allotment but extended indefinitely the trust period for already-allotted lands. Through the operation of these two statutes, therefore, the United States came to hold an estimated 11 million acres of land as trustee for, and with a fiduciary duty to, individual Indian beneficiaries. In 1994 the Congress enacted the Indian Trust Fund Management Reform Act, Pub. L. No. 103–412, 108 Stat. 4239 (codified as amended at 25 U.S.C. § 4001 et seq.) ("1994 Act"), recognizing these responsibilities and identifying some of the Government's duties to ensure it meets them. The plaintiffs' lawsuit alleges a breach of these responsibilities.

The duties of the United States as trustee have been delegated to the Secretary of the Interior and the Secretary of the Treasury, *see* 25 U.S.C. §§ 161–161a, 4001–4011, each of whom is assigned specific tasks. Also relevant to this appeal is the Office of the Special Trustee within the Department of the Interior (and subordinate to the Secretary), which was created by the 1994 Act to oversee the trust reform activities of the Department. *Id.* §§ 4042–4043.

A. Previous Proceedings

The plaintiffs filed this lawsuit in 1996. In 1998 the district court divided the litigation into two "phases." Phase I was to

address "fixing the system," that is, "reforming the management and accounting of the IIM trust," and Phase II would concern "correcting the accounts" by "performing a historical accounting of the IIM trust accounts." In 1999 the district court held Secretary of the Interior Bruce Babbitt, Assistant Secretary Kevin Gover, and Secretary of the Treasury Lawrence Summers had breached their fiduciary duties. The court issued a declaratory judgment to that effect and remanded the case to the Interior and Treasury Departments for them to bring themselves into compliance with the law, and to take certain steps the court deemed necessary to provide an accounting of the IIM trust. *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 58 (D.D.C.) ("*Cobell V*"). In order to assure the defendants' compliance, the court retained jurisdiction and ordered the defendants to file quarterly status reports "setting forth and explaining the steps that defendants have taken to rectify" the breach. *Id.* at 59. Finally, the court certified its decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.*

In February 2001 we affirmed the order of the district court: The Government indeed had breached its fiduciary duty. Among many other things, it "does not know the precise number of IIM trust accounts that it is to administer and protect," and "it does not know the proper balances for each IIM account." *Cobell VI*, 240 F.3d at 1089. Although we determined that the district court had mischaracterized some of the defendants' actions – for instance, their failure to "retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting" – as independent violations of a fiduciary duty, rather than as "support for the … court's ultimate conclusion that appellants have unreasonably delayed the discharge of their fiduciary obligations to IIM beneficiaries," 240 F.3d at 1104, 1105, we upheld the district court's "ultimate conclusion" as fully justified. *Id.* at 1105. We also held the district court's remand of the matter to the agencies and its retention of jurisdiction were appropriate remedies. *Id.* at 1107–09.

B.   The Orders on Appeal

While *Cobell VI* was pending before us and thereafter, the Department and its officers took a number of steps relevant to this appeal.  Beginning in March 2000 and continuing apparently to the present, the Department filed the quarterly reports required by *Cobell V*.  In April 2000 the Department published a notice in the Federal Register proposing a method for performing an historical accounting and seeking public comment thereon;  and in December 2000 it chose statistical sampling as the method it would use.

In April 2001 the district court appointed Kieffer as Court Monitor.  As noted, the Department consented to this appointment, regarding which it expressed the "hope that this will in fact be a positive step forward so that resources can be more directed towards trust reform and less directed towards litigation."  The order appointing Kieffer stated he would "serve for at least 1 year from this date.  Upon order of the Court, after comment or objection thereto by the parties, his term of service may be extended for additional terms."  In April 2002 the district court "propose[d] to extend Mr. Kieffer's term of service for at least an additional year."  The Department objected to Kieffer's reappointment unless several conditions were met.  The district court accepted some but not all those conditions, and reappointed Kieffer.

Four days later (April 19) Kieffer, with authorization from the district court, attended a meeting with Deputy Secretary of the Interior J. Steven Griles, the Special Trustee, and other departmental officials;  the plaintiffs were not represented at the meeting.  The district court found this was one of many internal DOI meetings Kieffer attended;  the meeting was called at Griles's request;  it was a "heated meeting [that] resolved nothing."  The district court also found that at the meeting the Court Monitor discussed with Interior officials his concerns about the way they were doing their jobs – concerns that he was subsequently to report to the district court.  The district court characterized Kieffer's actions as "an effort to set the stage to convince the parties attending the meeting to find some way to work together."

On June 14 the Department moved the district court to revoke Kieffer's appointment as, and to clarify the role of, the Court Monitor. The Department argued that its previous objections "presaged" the April 19 meeting, at which, the Department claimed, Kieffer demonstrated his intention and his ability to assert powers constitutionally reserved to the Executive Branch of the Government.

Meanwhile the Monitor's reports, which were, to say the least, unflattering to the DOI, had prompted the district court to order Secretary Norton and Assistant Secretary McCaleb, both of whom had taken office in 2001, to "show cause why they should not be held in civil contempt of court in their official capacities" on five "specifications," namely:

(1) Failing to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project.

(2) Committing a fraud on the Court by concealing the Department's true actions regarding the Historical Accounting Project during the period from March 2000, until January 2001.

(3) Committing a fraud on the Court by failing to disclose the true status of the TAAMS project between September 1999 and December 21, 1999.[*]

(4) Committing a fraud on the Court by filing false and misleading quarterly status reports starting in March 2000, regarding TAAMS and BIA [Bureau of Indian Affairs] Data Clean-up.[**]

(5) Committing a fraud on the court by making false and misleading representations starting in March, 2000, regarding computer security of IIM trust data.

---

* TAAMS, the Trust Asset and Accounting Management System, is a new computer system expected to enable Interior better to track the status of property held in trust for IIM account beneficiaries.

** "BIA Data Clean-up" refers to Interior's effort to remedy shortcomings in the data in the Department's current computer systems so that those data can be transferred into TAAMS.

*Cobell v. Norton*, 226 F. Supp. 2d 1, 19–20 (D.D.C. 2002) ("*Contempt Opinion*"). The district court held a 29–day bench trial on the contempt charges.

On September 17, 2002 the district court issued the three Orders that are the subject of this appeal. First, the court issued an Order that, among other things, held Secretary Norton and Assistant Secretary McCaleb "in civil contempt of court." *Cobell v. Norton*, 226 F. Supp. 2d 161, 161 (D.D.C.) ("*Contempt Order*"). The *Contempt Order* was accompanied by and explained in the *Contempt Opinion*, released simultaneously. Second, the district court issued a Memorandum and Order denying the defendants' motion to revoke Kieffer's appointment as Court Monitor. *Cobell v. Norton*, 226 F. Supp. 2d 163 (D.D.C.) ("*Monitor Order*"). Finally, the court issued an Order appointing Kieffer to serve as "Special Master–Monitor" "[p]ursuant to Rule 53 of the Federal Rules of Civil Procedure." *Cobell v. Norton*, 2002 U.S. Dist. LEXIS 17354, at *1 (D.D.C.) ("*Special Master-Monitor Order*").

In the *Contempt Order*, the court addressed each of the five specifications of contempt. With regard to the first count, the court described Norton's and McCaleb's failure to comply with its earlier order as "litigation misconduct." In each of the other specifications, the court found Norton and McCaleb to have "committ[ed] a fraud on the Court." 226 F. Supp. 2d at 161. The district court used some harsh words in the *Contempt Opinion*, expressing its dissatisfaction with the defendants' conduct. *See, e.g.*, 226 F. Supp. 2d at 125 ("The Department of Interior is truly an embarrassment to the federal government in general and the executive branch in particular. The 300,000 individual Indian beneficiaries deserve a better trustee-delegate than the Secretary of Interior"); *id.* at 113 ("The Court is both saddened and disgusted by the Department's intransigence"). Of particular note are the district court's statement that "Secretary Norton and Assistant Secretary McCaleb can now rightfully take their place alongside former-Secretary Babbitt and former-Assistant Secretary Gover in the pantheon of unfit trustee-delegates," *id.* at 161, and the court's invitation to Secretary Norton or any other individual at the Department who

"feel[s] that as a result of th[e] Court's ruling they are unable or unwilling to perform their duties to the best of their ability" to "leave the Department forthwith." *Id.* at 133.

Turning to the question of relief, the court refused the plaintiffs' request that it appoint a receiver to take over the IIM trust. The court did, however, determine that the relief it had ordered in *Cobell V* – remanding the case to the agencies to carry out their duties as instructed – "was and is insufficient," *id.* at 147, and it therefore contemplated "granting further injunctive relief." *Id.* at 148. To that end the court scheduled further proceedings, which it called the "Phase 1.5 trial." *Id.* In order to prepare for the Phase 1.5 trial, the court required Interior to file "a plan for conducting a historical accounting of the IIM trust accounts" and "a plan for bringing themselves into compliance with the fiduciary obligations that they owe to the IIM beneficiaries." *Contempt Order*, 226 F. Supp. 2d at 162. The court also permitted the plaintiffs (and the Department of the Treasury) to file such plans, and permitted each party to respond to any other party's plan. *Id.*

In the *Monitor Order*, the court denied the Department's June 14 motion to revoke the appointment of Court Monitor Kieffer. The court found that Kieffer's participation in the April 19 meeting was not inappropriate or beyond his authority because it was "pursuant to the Secretary of the Interior's *own request*" and "in conformance with the Orders of the Court." 226 F. Supp. 2d at 169. Finally, in the *Special Master-Monitor Order*, the court sua sponte elevated Kieffer to the position of Special Master-Monitor; Kieffer retained his duties as Court Monitor and as Special Master assumed new responsibilities for the management of discovery. 2002 U.S. Dist. LEXIS 17354, at *4–7.

Secretary Norton and Assistant Secretary McCaleb appealed all three Orders of the district court. They argue that the district court overstepped the bounds of judicial authority by declaring them "unfit" and by "seizing control of the processes for creating and implementing plans for Indian trust reform." They also argue that the district court erred when

it held them in contempt of court, denied their motion to terminate Kieffer's tenure as Court Monitor, and appointed him Special Master-Monitor.*

## II.  Analysis

We understand the Government to object to three distinct aspects of the district court's Orders in this case: (1) the court's alleged overreaching through its "assum[ption of] control" over functions within the DOI; (2) the court's decisions regarding the status of Mr. Kieffer; and (3) the court's holding Secretary Norton and Assistant Secretary McCaleb in contempt of court.  Before we may reach these issues, however, we must confirm our jurisdiction over this interlocutory appeal.

### A.  Jurisdiction

The Department argues we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).  In the alternative it seeks a writ of mandamus.

Section 1292(a)(1) provides that "the courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  As the Supreme Court stated in *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981), § 1292(a)(1) provides jurisdiction over not just an injunction so-denominated, but over any order having the "practical effect" of an injunction if the order threatens a "serious, perhaps irreparable, consequence" and is of such a nature that it can be "effectually challenged only by immediate appeal."  "An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not

---

* Norton and McCaleb also moved to present arguments in their individual capacities.  Construing these as motions to appear as amici curiae, we grant them and dispose of other motions pending in this case in an order issued today.

appealable under § 1292(a)(1)." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988).

A writ of mandamus is "an extraordinary remedy, to be reserved for extraordinary situations." *Id.* at 289. Mandamus does not lie unless the petitioner's right to relief is "clear and indisputable," and there is "no other adequate means" by which the petitioner may attain the relief it seeks. *In re Sealed Case*, 151 F.3d 1059, 1063 (D.C. Cir. 1998).

With these legal principles in mind, we consider our jurisdiction over each of the Department's three claims.

1.  Judicial Overreaching

The Department argues we have jurisdiction over its claim of judicial overreaching pursuant to § 1292(a)(1) because the district court's rulings (1) imposed an injunction; or (2) had "the practical effect of an injunction"; or (3) worked "a modification of a declaratory judgment that the [district] court has [since] held to be indistinguishable from a mandatory injunction." The gravamen of the Department's argument, however expressed, is that the district court orders "both require[ ] action and implicitly enjoin[ ] the Secretary's future exercise of discretion."

We disagree. As the plaintiffs demonstrate, the *Orders* and the *Opinion* were full of sound and fury, but they signified very little to be done by the DOI. In the *Contempt Order* the court appointed a Special Master–Monitor, 226 F. Supp. 2d at 163 ¶ ¶ 13–16, and required the defendants, in anticipation of the Phase 1.5 trial, to "file with the Court . . . a plan for conducting a historical accounting of the IIM trust accounts" and to file a plan for "bringing themselves into compliance with [their] fiduciary obligations." *Id.* at 162 ¶ ¶ 2, 3. It also held Secretary Norton and Assistant Secretary McCaleb in contempt, *id.* at 161 ¶ ¶ 1–5, and ordered them to pay the expenses the plaintiffs had incurred for the contempt trial. *Id.* at 162 ¶ ¶ 9–10.*

---

* In the *Contempt Order* the district court also entered a declaratory judgment on an unrelated matter, *see* 226 F. Supp. 2d at 161–62 ¶ 1, and referred certain matters to another special master. *Id.*

None of this had the "practical effect" of an injunction. The *Contempt Order* compels the Department only to prepare for the Phase 1.5 proceedings by making certain filings with the court. As such, we think it more akin to an "order . . . relat[ing] only to the conduct or progress of litigation," *Gulfstream Aerospace*, 485 U.S. at 279, than to an injunction.

The Department also points to the district court's statement that it will order new relief following the Phase 1.5 trial rather than "simply remand[ing] the matter back to the agency," *Contempt Opinion*, 226 F. Supp. 2d at 152, as evidence that the court intends to take over the management of trust reform. Such a claim is premature. To be sure, the district court stated it "has determined that it will grant further injunctive relief," *id.* at 146 – specifically, "a structural injunction," *id.* at 146 n.154 – presumably upon completion of the Phase 1.5 trial. Any such injunction, once issued, would be appealable under § 1292(a)(1). But no such injunction has yet issued. At worst, the district court has threatened to take action that, according to the Department, would violate the separation of powers. Until the district court takes such action, however, we are without power under § 1292(a)(1) to review its decisions.

Anticipating that the court might lack jurisdiction to hear the present appeal, the Department asks us in the alternative to issue a writ of mandamus providing equivalent relief. But we may not do that, either. The Department's challenge does not meet the criteria for the writ; in particular, the Department has not shown that an appeal from the district court's eventual entry of an injunction, if and when that occurs, would not provide it with adequate relief.

   2.   Kieffer's Appointment as Monitor and as Special Master-Monitor

The Department concedes that "[t]he court's order elevating the Court Monitor to the judicial role of Special Master would not generally be immediately appealable." Neverthe-

---

at 162–63 ¶ ¶ 11–12. The Department does not seek review of those provisions of the *Contempt Order*.

less the Department claims that Kieffer's appointment is subject to interlocutory review both because it "forms an integral part of the relief the court believed was required" and because it "has the effect of an injunction." These claims are essentially a restatement of those we have already rejected as part of the Department's claim of judicial overreaching. We see no need to revisit them under a new heading.

The orders appointing Kieffer – first as Court Monitor, and later as Special Master-Monitor – and the order denying the Department's motion to revoke Kieffer's appointment as Court Monitor do, however, present an appropriate occasion for mandamus. First, as we explain below (in Part II.B), the Department's entitlement to relief is clear. Second, there is no other way for the Department to obtain effective relief on its claims that Kieffer should not have been appointed Special Master–Monitor, nor permitted to continue as Court Monitor.

The ordinary route to relief from an adverse interlocutory order is to appeal from the final judgment. When the relief sought is recusal of a disqualified judicial officer, however, the injury suffered by a party required to complete judicial proceedings overseen by that officer is by its nature irreparable. As the Supreme Court has explained:

> The remedy by appeal is inadequate. It comes after the trial and, if prejudice exist, it has worked its evil and a judgment of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or decision than a disposition of a mind in which there is a personal ingredient.

*Berger v. United States*, 255 U.S. 22, 36 (1921); *see In re United States*, 666 F.2d 690, 694 (1st Cir. 1981) ("A case involving a motion for disqualification is clearly distinguishable from those where a party alleges an error of law that . . . may be fully addressed and remedied on appeal"). The parties agree that after his elevation to Special Master-Monitor status, Kieffer was serving as a judicial officer.

Although this court does not seem to have ruled upon the propriety of seeking the recusal of a judicial officer by

petition for a writ of mandamus, every circuit to have addressed the issue has found it proper. The First through Seventh Circuits and the Tenth Circuit have each issued the writ for this purpose, *see In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001); *In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995); *In re Antar*, 71 F.3d 97 (3d Cir. 1995); *In re Sch. Asbestos Litig.*, 977 F.2d 764 (3d Cir. 1992); *In re Rodgers*, 537 F.2d 1196 (4th Cir. 1976); *In re Faulkner*, 856 F.2d 716 (5th Cir. 1988); *In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136 (6th Cir. 1990) (en banc); *In re Hatcher*, 150 F.3d 631 (7th Cir. 1998); *In re Edgar*, 93 F.3d 256 (7th Cir. 1996); *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995), and the Eighth, Ninth, and Eleventh Circuits have suggested they would do so in an appropriate case. *See Pfizer, Inc. v. Lord*, 456 F.2d 532, 536–37 (8th Cir. 1972) (holding mandamus is an appropriate avenue to review recusal decision but denying the writ on the facts presented); *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 999 (9th Cir. 2003) (similar); *In re Lopez–Lukis*, 113 F.3d 1187, 1188 (11th Cir. 1997) (denying writ seeking review of recusal decision because "petitioners have not carried their burden of showing their right to issuance of a writ of mandamus"). The Federal Circuit looks to the law of the regional circuit in which the officer to be recused sits. *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 556–57 (1996); *In re Solex Robotics, Inc.*, Misc. No. 725, 2003 U.S. App. LEXIS 1595 (Jan. 17, 2003) (unpublished). We join the unanimous view of our sister circuits and hold that we will issue a writ of mandamus compelling recusal of a judicial officer where the party seeking the writ demonstrates a clear and indisputable right to relief.

We also find it appropriate to issue the writ in order to clarify that the district court exceeded its authority when it reappointed Kieffer as Court Monitor over the Department's objection. As we discuss below, the Department's right to relief is clear, and the injury it alleges – interference with the internal deliberations of a Department of the Government of the United States – cannot be remedied by an appeal from

the final judgment.  *In re Sealed Case*, 151 F.3d at 1063.*

### 3.  Contempt Findings

The district court styled the contempt in which it held the appellants civil in nature.  In this circuit an order holding a party in civil contempt in an on-going proceeding is not appealable as a final order.  *Byrd v. Reno*, 180 F.3d 298 (D.C. Cir. 1999) (per curiam).  In contrast, "[c]riminal contempt judgments are immediately appealable pursuant to § 1291 because they result from a separate and independent proceeding . . . to vindicate the authority of the court and are not a part of the original cause."  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985).  As we explain below (in Part II.C.1), the district court's findings of contempt are functionally criminal rather than civil in nature.  Therefore, we have jurisdiction over this appeal from the contempt aspects of the *Contempt Order*.

### B.  Court Monitor/Special Master-Monitor Issues

We turn now to the merits of the Department's claim the district court erred by retaining Kieffer in this case.  Specifically, the Department argues both that the court had no authority to reappoint Kieffer as Court Monitor over its objection, and that Kieffer was disqualified from serving as Special Master-Monitor due to his personal knowledge of the case and the resulting appearance of partiality.

### 1.  Court Monitor

Kieffer was appointed Court Monitor on April 16, 2001, with the consent of the parties, for a term of one year.  In April 2002 the Government objected to Kieffer's reappointment unless certain conditions were placed upon the scope of

---

* The plaintiffs contend we should not issue the writ because the Department did not file a separate petition for mandamus, which they claim is required by Federal Rule of Appellate Procedure 21 and Circuit Rule 21.  For its part, the Government points to our prior decision treating an improper interlocutory appeal as a petition for mandamus, *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 & n.6 (1992), in the light of which we deem the Government's omission excusable.

his powers. On April 15, 2002, the district court reappointed him without regard to one of those conditions. The Department claims this was a clear error. We agree.

The district court claimed authority to appoint the Monitor in the first instance based upon the "consent of the [parties], and ... the Court's inherent powers." The Government claims it did not consent to Kieffer's reappointment, however, and neither the district court nor the plaintiffs point to any case or other authority suggesting a district court has inherent power to appoint a court monitor. Indeed, in their brief the plaintiffs, tellingly, do not address the Department's argument that the district court could not appoint a court monitor over its objection. At oral argument the plaintiffs instead rested upon the assertion that the DOI's consent to Kieffer's original appointment as Court Monitor was temporally unlimited and irrevocable.

The plaintiffs' position is untenable on the facts of this case. First, the district court did not propose or purport to appoint Kieffer permanently, so the DOI had no occasion to consent to his having an unlimited tenure. As we noted earlier, the order appointing him stated that Kieffer would "serve for at least 1 year from this date. Upon order of the Court, after comment or objection thereto by the parties, his term of service may be extended for additional terms." The plaintiffs' suggestion that this order, which explicitly grants the parties the right to object to Kieffer's reappointment, actually served as consent to his unlimited tenure, is absurd. We conclude the Department effectively withheld its consent to the court's reappointment of Kieffer as Monitor, which brings us to the question whether the district court has inherent power to appoint a monitor without the consent of the party to be monitored.

A judicial claim to an "inherent power" is not to be indulged lightly, lest it excuse overreaching "[t]he judicial Power" actually granted to federal courts by Article III of the Constitution of the United States, and the customs and usages that inform the meaning of that phrase. Such a claim, therefore, must either be documented by historical practice,

*see, e.g., Miner v. Atlass*, 363 U.S. 641, 643–44 (1960) (rejecting contention that federal court sitting in admiralty has inherent power to order taking of depositions for discovery because there was no historical record of courts ordering such depositions); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–30, 631 (1962) (noting court's inherent power to dismiss suit for failure to prosecute dates to Blackstone's Commentaries and "has long gone unquestioned"), or supported by an irrefutable showing that the exercise of an undoubted authority would otherwise be set to naught. *See, e.g., Chambers v. NASCO*, 501 U.S. 32, 43 (1991) ("It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others"); *cf.* All Writs Act, 28 U.S.C. § 1651(a) (granting federal courts power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"). Often the two go hand in hand. *See, e.g., Fisher v. Pace*, 336 U.S. 155, 159 (1949) ("Historically and rationally the inherent power of courts to punish contempts in the face of the court without further proof of facts and without aid of jury is not open to question. This attribute of courts is essential to preserve their authority and to prevent the administration of justice from falling into disrepute"). In this case, however, we find nothing but the district court's assertion it has inherent power to appoint a monitor, which can hardly be self-supporting. Therefore, we hold the district court does not have inherent power to appoint a monitor – at least not a monitor with the extensive duties the court assigned to Kieffer – over a party's substantial objection, here the Government's objection that the appointment violated the separation of powers. As the foregoing sentence conveys, our holding is a narrow one, tethered to the peculiar facts recounted below.

In this case the Court Monitor was charged to "monitor and review all of the Interior defendants' trust reform activities" and to report to the district court on "any . . . matter [he] deem[ed] pertinent to trust reform." The court autho-

rized the Monitor to engage in ex parte communications, and required the DOI to "facilitate and assist" the Monitor, to "provide [him] with access to any . . . offices or employees to gather information," and to pay his hourly fees and expenses. In short, the Monitor acted as an internal investigator, not unlike a departmental Inspector General except that he reported not to the Secretary but to the district court.

Although the Department initially consented to this arrangement, after a year's experience it conditioned its renewed consent upon a narrower and more specific definition of the Monitor's role: The DOI sought to limit the scope of the Monitor's investigation to "steps taken by the Department to rectify the breaches of trust declared by the Court or steps taken that would necessarily delay rather than accelerate the ultimate provision of an adequate accounting." It later augmented its objection to the Monitor's role, arguing that the Monitor's broad-ranging investigation interfered with the Department's deliberative process privilege under *Hinckley v. United States*, 140 F.3d 277, 284–85 (D.C. Cir. 1998) (describing privilege as protecting materials that are both "predecisional" and "deliberative"); *see also Morgan v. United States*, 304 U.S. 1, 18 (1938) ("[I]t was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he [did what] the law required"), and that the Monitor otherwise intruded unduly into the function of the Executive Branch. We need not decide, however, whether the Department's objection was meritorious; it is enough for present purposes that the objection was colorable.

Regardless whether the district court has any inherent authority to appoint an agent to monitor the conduct of a party in litigation before it, it was surely impermissible to invest the Court Monitor with wide-ranging extrajudicial duties over the Government's objection. The Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself. The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system. When the parties

consent to such an arrangement, we have no occasion to inject ourselves into their affairs. When a party has for a non-frivolous reason denied its consent, however, the district court must confine itself (and its agents) to its accustomed judicial role.

Although the plaintiffs did not bring it to our attention, we are aware of the practice of a federal district court appointing a special master pursuant to Rule 53 to supervise implementation of a court order, especially a remedial order requiring major structural reform of a state institution. *See, e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115, 1161–62 (5th Cir.) (prison reform), *amended in part, reh'g denied in part on other grounds*, 688 F.2d 266 (5th Cir. 1982); *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 111 (3d Cir. 1979) (en banc) (reform of institution for the mentally retarded), *rev'd on other grounds*, 451 U.S. 1 (1981); *Gary W. v. State of Louisiana*, 601 F.2d 240, 244–45 (5th Cir. 1979) (same); *id.* (collecting cases); Ross Sandler & David Schoenbrod, Democracy by Decree 55–57 (2003). Putting aside the question whether those cases shed any light whatsoever upon the propriety of a federal court authorizing its agent to interfere with the affairs of another branch of the federal government, we think the present case goes far beyond the practice that has grown up under Rule 53.

*Ruiz* illustrates the limits of the mandate a district court may permissibly give its agent. There the district court, having found the defendant state department of corrections subjected inmates to cruel and unusual conditions, entered an injunction and appointed a special master, assisted by several "monitors," 679 F.2d at 1159, "to monitor implementation of the relief ordered." *Id.* at 1128. The special master was given "unlimited access to [the defendants'] premises and records as well as the power to conduct confidential interviews with . . . staff members and inmates." *Id.* at 1162. On appeal, the State argued the appointment was improper because there was no "exceptional condition" warranting it, as required by Rule 53. In rejecting that argument, the court of appeals approved the special master's mandate, namely, "to report on [the department's] compliance with the district

court's decree and to help implement the decree," thereby "assum[ing] one of the plaintiffs' traditional roles." *Id.* at 1161.

The role of the special master in *Ruiz* was not nearly as broad as the role of the Monitor in this case. There the master was specifically instructed "not to intervene in the administrative management of [the department] and . . . not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance." *Id.* at 1162. Most important, the court of appeals clarified that the special master and the monitors were "not to consider matters that go beyond superintending compliance with the district court's decree," thereby assuring the special master would not be an "advocate" for the plaintiffs or a "roving federal district court." *Id.*

The last requirement highlights the problems with the role of the Monitor in this case, and with his appointment. The Monitor was not limited to "superintending compliance with the district court's decree," but was instead ordered to "monitor and review all of the . . . defendants' trust reform activities," including "the defendants' trust reform progress and any other matter Mr. Kieffer deems pertinent to trust reform." Nor could the Monitor have been limited to enforcing a decree, for there was no decree to enforce, let alone the sort of specific and detailed decree issued in *Ruiz* and typical of such cases. *See* Sandler & Schoenbrod, above, at 9 (referring to "court decrees that are as thick as phone books"). The case had been remanded to the Department "for further proceedings not inconsistent with" the opinion of the district court in order "[t]o allow defendants the opportunity to promptly come into compliance." *Cobell V*, 91 F. Supp. 2d at 58. *Cf., e.g., Halderman*, 612 F.2d at 111 (allowing special master to administer implementation of injunction and noting that "[m]asters are peculiarly appropriate in the implementation of complex equitable decrees which require ongoing judicial supervision"). In this case, the district court's appointment of the Monitor entailed a license to intrude into the internal affairs of the Department, which simply is not permissible under our adversarial system of justice and our

constitutional system of separated powers. Accordingly, the district court should not have reappointed the Court Monitor on April 15, 2002 over the Department's objection.

2. Special Master-Monitor

In its June 14 motion to revoke Kieffer's appointment and clarify the role of the Court Monitor, the Department among other things complained that Kieffer's actions at the April 19, 2002 ex parte meeting had created an appearance of partiality. The district court not only rejected the Department's arguments, it supplemented Kieffer's role by appointing him Special Master-Monitor. Again the Department claims this was clear error. Again we agree.

The relevant standard is to be found at 28 U.S.C. § 455(a): A judicial officer must be disqualified from "any proceeding in which his impartiality might reasonably be questioned," that is, questioned by one fully apprised of the surrounding circumstances. *Sao Paulo State of the Federative Republic of Brazil v. Am. Tobacco Co., Inc.*, 535 U.S. 229, 232–33 (2002) (per curiam). It is clear, notwithstanding the plaintiffs' objections, that in this Circuit the ethical restrictions of § 455 apply to a special master. *Jenkins v. Sterlacci*, 849 F.2d 627, 630–32 & n.1 (D.C. Cir. 1988). So much for the law; for the facts we rely solely upon the district court's own recitation, which establishes that Kieffer's prior role and personal involvement in this case as Court Monitor would cause a reasonable person to doubt his ability to remain impartial while serving as Special Master.

For instance, Kieffer was "permitted to make and receive ex parte communications with all entities," *Monitor Order*, 226 F. Supp. 2d at 165, and in fact engaged in numerous ex parte communications with officials of Interior. *Id.* at 167. Moreover, in the course of his investigation Kieffer acquired information upon the basis of which he "apprised the Deputy Secretary that there was a dispute developing between the Secretary and the Special Trustee . . . regarding the appropriate role of the Special Trustee." *Id.* at 170. The Court Monitor was also present at the "heated" ex parte meeting on April 19, 2002, about which he reported to the Court that

"defendants were unwilling to fully accept the Congressional-ly-mandated role of the Special Trustee." *Id.* at 171. At that meeting, Kieffer "expressed his concerns to the Deputy Secretary about the actions of the Secretary and the Deputy Secretary regarding the Special Trustee." *Id.* In particular, he "apprise[d] the Deputy Secretary in the presence of the Special Trustee of the obvious risks faced by the defendants in this litigation and the additional concerns he had regarding" some of the Secretary's views, in "an effort to set the stage to convince the parties attending the meeting to find some way to work together rather than continue the internecine warfare patently obvious in their own dueling memoranda." *Id.* at 172.

The district court's account of these events demonstrates that Kieffer had a settled opinion about what the Department should and should not do on remand to comply with the order of the district court, which opinion he developed in his extrajudicial role as Court Monitor with access to the internal deliberations of the Department regarding the lawsuit. The district court's account also demonstrates that Kieffer's opinion was based in part upon ex parte communications received in his extra-judicial capacity as Monitor. These facts so clearly cast a shadow over Kieffer's impartiality that the district court abused its discretion in appointing Kieffer to be Special Master (in addition to Monitor).

The plaintiffs argue the April 19 meeting was not "extrajudicial" because it took place with the knowledge and approval of the district court and of the parties. That does not change the key fact: The district court appointed Kieffer to a judicial role in a case in which he had significant prior knowledge obtained in his role as a Court Monitor, on the basis of which he had formed and expressed opinions of continuing relevance to the litigation. A newly appointed judge may not hear a case in which he previously played any role. *See* 28 U.S.C. § 455(b)(3) (a judge shall recuse himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy"); ABA Model

Code of Judicial Conduct Canon 3(E)(1)(b) (a judge is disqualified when "the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it"). Similarly here, Kieffer's experience as Court Monitor disqualified him from later assuming a judicial role in this case. Accordingly, the order appointing Kieffer to be a Special Master-Monitor must be vacated.*

C. Contempt Specifications

The district court held Secretary Norton and Assistant Secretary McCaleb in "civil contempt of court" (1) for having engaged in "litigation misconduct," to wit, "failing to comply with the Court's Order of December 21, 1999," and (2–5) for having, in each of four ways, "committ[ed] a fraud on the Court." *Contempt Order*, 226 F. Supp. 2d at 161. The Department claims the district court erred in two respects: by holding Norton and McCaleb in contempt (1) based upon conduct of their predecessors in office, and (2) without finding either officer had disobeyed a clear order of the court. The Department also argues the district court's factual findings do not support its conclusion that there was a fraud on the court. In response the plaintiffs argue the district court correctly

---

* In light of this disposition we need not and do not pass upon the DOI's objections to the propriety of Kieffer's actions at the April 19 meeting or at any other time prior to his appointment as Special Master-Monitor. The events of April 19 do, however, suggest the Department's concerns about the scope of the Court Monitor's role were well-founded. The district court's findings indicate that the Court Monitor's duties were so wide-ranging as to have a potentially significant effect upon the DOI's deliberative process. *See Monitor Order*, 226 F. Supp. 2d at 172 (Court Monitor's presentation was "an effort to set the stage to convince the parties attending the meeting to find some way to work together"); *id.* (Court Monitor "sought to . . . enable [DOI officials] to better carry out [their] trust reform fiduciary obligations"); *id.* at 172 n.6 (Court Monitor, with authorization of district court, "attempt[ed] to facilitate a resolution of the continuing dispute between the Secretary, the Deputy Secretary, and the Special Trustee").

applied the law to the facts. We agree with the Department, although our analysis is somewhat different.

1. Nature of the Contempt

A contempt proceeding is either civil or criminal by virtue of its "character and purpose," not by reason of the trial judge so denominating the proceeding. *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). Civil contempt is ordinarily used to compel compliance with an order of the court, *Bagwell*, 512 U.S. at 828, although in some circumstances a civil contempt sanction may be designed to "compensate[ ] the complainant for losses sustained." *Id.* at 829. By contrast, criminal contempt is used to punish, that is, to "vindicate the authority of the court" following a transgression rather than to compel future compliance or to aid the plaintiff. *Id.* at 828.

In this case the nature of the contempt is obscured by the lack of any clear sanction. Although it did, under the heading "Further Relief," expand the scope of the plaintiffs' discovery, *Contempt Opinion*, 226 F. Supp. 2d at 159, the district court itself noted that

> much of the relief granted is not dependent on the Court's conclusion that the defendants committed several frauds on the Court. Rather, the Court has fashioned much of the relief granted today (such as future proceedings and the appointment of a special master) simply because of the current status of trust reform.

*Id.* at 135. In fact, other than an award of expenses the plaintiffs incurred in the contempt trial, 226 F. Supp. 2d at 162 – which cannot be considered relief for the underlying contempt – the only relief granted that could conceivably be based upon the findings of contempt are the initiation of the Phase 1.5 proceeding and the appointment of the Special Master. On its face, that is, the *Contempt Order* appears to find the defendants in contempt, and then to impose no sanction.

Clearly, however, the district court did not intend its decision to be without effect. The exceedingly strong words it used in finding the defendants in contempt – in particular its statement that Secretary Norton was "unfit" – suggest the court intended the adjudication and accompanying opinion to serve as a reprimand to Secretary Norton and Assistant Secretary McCaleb. Indeed, the defendants reasonably characterize the decision as having "impose[d] opprobrium" upon them. Norton and McCaleb in particular believed the district court's adjudication to be so injurious to their reputations that they engaged private counsel and sought to intervene as appellants and to present arguments in their respective personal capacities. We see no reason a district court may not impose a reprimand as the sole sanction for an adjudication of contempt, particularly when the contemnor is a public official acting in her official capacity.

Examining this sanction in light of the principles set forth in *Gompers* and *Bagwell*, therefore, it is clear the proceeding was, and should have been treated as being, for criminal contempt. In specifications two through five, the district court cites completed conduct of the defendants (or of their predecessors in office), making the proceeding criminal in nature. *Bagwell*, 512 U.S. at 829 ("When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect" and is therefore punitive in nature); *id.* at 828 (describing a sanction as criminal "if it is imposed retrospectively for a 'completed act of disobedience' " (quoting *Gompers*, 221 U.S. at 443)). Moreover, in each of those four specifications the district court held the defendants in contempt for "[c]ommitting a fraud on the Court," *Contempt Opinion*, 226 F. Supp. 2d at 20, citing as authority a Supreme Court opinion assimilating fraud on the court to criminal rather than to civil contempt. *Id.* at 26 (citing *Pendergast v. United States*, 317 U.S. 412 (1943)). We have been unable to find any authority for, let alone any reason to believe, the proposition that fraud on the court constitutes a civil contempt. We therefore treat the district court's contempt citations on specifications two through five as criminal in nature.

We also note that, although the district court said in the *Contempt Opinion* it was not "issu[ing] a contempt citation at this time with respect to Specification 1," *id.* at 118, the accompanying *Contempt Order* is ambiguous on this score and the court later interpreted it otherwise. The statement that the defendants had "engaged in litigation misconduct" appeared under the heading "Contempt Specifications." 226 F. Supp. 2d at 161. In a later opinion addressing a motion to disqualify the District Judge, Special Master-Monitor Kieffer, and another special master from participation in contempt proceedings against certain non-parties, the district court further muddied the waters, stating that on September 17 it indeed had held the defendants in contempt for, among other things, "engaging in litigation misconduct by failing to comply with the Court's Order" as described in specification one. *Memorandum and Order,* at 5–6 (Jan. 17, 2003). We therefore treat specification one as a finding of contempt, also criminal in nature.

Although one may be held in civil contempt for refusing to comply with a court order, a sanction for one's past failure to comply with an order is criminal in nature. *Bagwell*, 512 U.S. at 828–29; *Gompers*, 221 U.S. at 443–44. The district court clearly intended to punish the defendants for "failing to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project," *Contempt Order*, 226 F. Supp. 2d at 161, which is no doubt why its opinion lacks any suggestion that the defendants could yet comply and thereby purge themselves of the contempt. *See Bagwell*, 512 U.S. at 828 (contempt is civil if "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket").

The contempt proceeding being criminal rather than civil in nature, and the allegedly contumacious behavior occurring outside the presence of the court, the defendants were entitled to the usual protections of the criminal law, such as trial by jury and proof beyond a reasonable doubt. *Id.* at 826–27. Because the Department has not objected upon any such

procedural ground, however, and explicitly disavowed any such objection at oral argument, we treat the same as waived.

In addressing the merits of the contempt specifications, we start with the elementary principle that, subject to certain exceptions clearly not relevant here, and absent *respondeat superior* liability, one person cannot be held criminally liable for the conduct of another. We further note that a finding of criminal contempt "requires both a contemptuous act and a wrongful state of mind." *In re Farquhar*, 492 F.2d 561, 564 (D.C. Cir. 1973).*

With these principles in mind, we can dispose quite readily of some of the district court's findings of contempt. Secretary Norton took office in January, Assistant Secretary McCaleb in July, 2001. Because specifications two and three concern conduct that took place prior to their taking office, the district court erred as a matter of law in holding either official in criminal contempt on those counts. The district court also erred in holding Assistant Secretary McCaleb in contempt on all five counts without having identified in the *Contempt Opinion* any specific act or omission whatsoever on his part. We address the other specifications of contempt, therefore, with reference to Secretary Norton alone.

2. Specification One

Specification one charged Secretary Norton with "[f]ailing to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project." *Contempt Opinion*, 226 F. Supp. 2d at 20. The district court said with regard to this specification that Secretary Norton had committed litigation misconduct, referring principally to its finding that "[b]etween December 21, 1999 and July 10, 2001" the Department had failed to take any steps toward completing an accounting.

---

* Although we have grave doubts about *respondeat superior* liability for a criminal contempt, we need not resolve them in this case. Even assuming it is permissible to hold a master in criminal contempt based in part upon the action of a servant, the discussion below makes clear that the requirements of *Farquhar*, quoted above, as well as general principles of contempt, preclude a finding of criminal contempt in this case.

*Id.* at 113. The court characterized the Department's actions taken since that time as "too little, too late," and stated that "Interior cannot rely on efforts undertaken" at the "late date" of June, 2001 "to avoid a contempt citation." *Id.* at 115. In fact, the district court described its holding as being that "the defendants unreasonably delayed initiating the historical accounting project." *Id.* at 118.

Because Secretary Norton cannot be held criminally liable for contempt based upon the conduct of her predecessor in office, her contempt conviction cannot stand; she simply cannot be held criminally to account for any delay that occurred prior to her assuming office. Of the one and one-half year delay about which the district court was concerned, more than a year was on someone else's watch.

Moreover, the district court's findings clearly indicate that in her first six months in office Secretary Norton took significant steps toward completing an accounting. By June 2001 the Secretary had contracted with EDS, a national consulting firm, to evaluate the status of the TAAMS project, *id.* at 86, and by November 2001 the Department had proposed a reorganization plan aimed at eliminating the problems EDS had identified. *Id.* at 45. In July 2001 Secretary Norton created the Office of Historical Trust Accounting, which has since made significant progress toward completing an accounting. *Id.* at 44–45. Hence, the Court Monitor stated in his Fifth Report, "[t]here is no doubt the OHTA has made more progress . . . in six months [July through December, 2001] than the past administration did in six years."

These uncontested facts are inconsistent with a finding that Secretary Norton failed to comply with the district court's order of December 21, 1999. Therefore, we hold the district court erred as a matter of law in holding Secretary Norton in criminal contempt on specification one.

3. Specification Four

In specification four the Secretary was held in contempt for committing a fraud on the court. We note initially that fraud on the court is a narrow concept, limited to "the most

egregious conduct involving a corruption of the judicial process itself." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2870, at 418 (2d ed. 1995).

The district court held Secretary Norton in contempt for "filing false and misleading quarterly status reports starting in March 2000, regarding TAAMS and BIA Data Cleanup." *Contempt Opinion*, 226 F. Supp. 2d at 124. Of those eight reports, however, the first four were filed prior to Secretary Norton's taking office, and she therefore cannot be held criminally liable for anything in them. The remaining reports do not rise to the level of fraud on the court.

The court complained that the fifth report provided a "positive assessment" of the status of TAAMS "based on nothing more than speculation and wishful thinking." *Id.* at 80. Of the sixth report, the district court said the Department was "misleading" the court when it represented "it was moving ever closer to being able to implement fully the title and realty portions of TAAMS," and that it "had conducted specific tests that indicated that it was almost ready to deploy TAAMS." *Id.* at 82. Regarding the seventh report, the court noted the Department's concession that it had not met certain goals and complained that the Department "presented a positive picture of TAAMS despite the fact that the agency was not ready to deploy or implement the land management system as scheduled, and . . . clearly was not going to be able to deploy or implement it anytime soon." *Id.* at 83. The court also objected that "Interior did not provide the Court with anything close to what can be construed as a complete picture of the system's status." *Id.*

Finally, with regard to the eighth report – which was the first to be filed after Interior had received EDS's assessment of the project – the court noted both Secretary Norton's concession that previous reports had been inadequate, and the Secretary's attempts to improve the quality of the reports. *Id.* at 84–85. The district court appeared to have no quarrel with the content of the eighth report. Instead, the court inferred from admissions in the eighth report that the

inadequacies of the previous reports were intentional and contumacious. *See id.* at 80 (completion dates in fifth report, "in light of the later filed quarterly status reports, [were] based on nothing more than speculation and wishful thinking"); *id.* at 82 (sixth report "particularly misleading (and troubling) in light of the Department's Eighth Report"); *see also id.* at 84 (quoting Secretary Norton's testimony that seventh report gave "an insufficient picture" and was "not a particularly good document").

We find the reasoning of the district court mystifying. The court is surely correct in stating that the eighth report does not "absolve[ ] the defendants" of responsibility for any past wrongdoing. *Id.* at 126. But neither does the Secretary's candid critique of prior reports, made in the light shed by EDS's evaluation, lead to the conclusion that those reports were intentionally false and misleading; the district court's findings of fact simply do not support its conclusion that Secretary Norton committed a fraud on the court. To be sure, the earlier reports painted an overly sunny picture of the status of the TAAMS project and were misleading about the progress being made in ways painstakingly identified by the district court. The district court made no finding, however, that Secretary Norton had any personal knowledge that the fifth, sixth, or seventh reports were false or misleading.

In light of the above, we conclude that the district court erred as a matter of law in holding Secretary Norton in criminal contempt on specification four.

4. Specification Five

In specification five, the district court found the Secretary committed a fraud on the court by making false and misleading representations "regarding computer security of IIM trust data." *Id.* at 100. The Department made representations on that subject under Secretary Norton in April and May 2001. The district court's findings as to those statements do not support its conclusion that Secretary Norton committed a fraud on the court.

The April representations appeared in the Department's Opposition to the Plaintiffs' Motion for Special Master Investigation; in particular, the court identified the statement that the Department had "made security a top priority and ha[d] taken numerous steps to improve the security of the Reston facility since the Special Master's visit," *id.* at 106, and the Department's outline of its completed and planned security improvements. *Id.* at 106–07. The district court also took issue with the Department's May 2001 Opposition to the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, insofar as the defendants argued the plaintiffs' "position [was] wholly without merit." *Id.* at 107.

The district court apparently found these statements to be false based upon the Report on IT Security prepared by a special master (not Kieffer), and upon "the Department's failure to dispute any of the underlying facts" set out in that report. *See id.* at 108. In the report, the special master had concluded the Department "has known about pervasive IT security deficiencies for more than a decade," *id.*, and found the Department "has not taken necessary actions to correct its numerous and longstanding IT security deficiencies," *id.* at 109, which the special master chronicled at length.

We see no finding of fact in the Report on IT Security, or in any opinion of the district court, that directly contradicts the statements in the Department's April Opposition, which the court identified as part of a fraud on the court. Absent a direct contradiction, the facts of this case do not support the implicit inference that Secretary Norton "has acted with an intent to deceive or defraud the court." *United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002). With respect to the statement in the Department's May Opposition, we think it inconceivable that a departmental secretary may be held to have committed a fraud on the court because an attorney representing her Department argued in an adversarial proceeding that an adversary's motion critical of the Department was "without merit."

We therefore conclude the district court erred as a matter of law in holding Secretary Norton in criminal contempt on specification five.

### III.   Conclusion

The *Contempt Order* is vacated insofar as it relates to the appointment and duties of the Special Master-Monitor.   The *Special Master-Monitor Order* is vacated.   The *Monitor Order*, denying the defendants' motion to revoke the appointment of Kieffer as Monitor, is vacated, and the district court is directed to enter an order granting that motion.

The *Contempt Order* is vacated insofar as it sanctions the defendants on specifications one through five and directs the payment of expenses and fees incurred by the plaintiffs.   The case is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*