# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2015        Decided June 23, 2015

No. 14-1203

IN RE: ABD AL-RAHIM HUSSEIN MUHAMMED AL-NASHIRI,
PETITIONER

On Petition for Writ of Mandamus and Prohibition to
the United States Court of Military Commission Review

*Michel D. Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for the petitioner. *Richard Kammen* was with him on the petition for writ of mandamus and the reply.

*John F. De Pue*, Attorney, United States Department of Justice, argued the cause for the respondent. *Steven M. Dunn*, Chief, Appellate Unit, and *Joseph F. Palmer*, Attorney, were with him on the opposition to the petition for writ of mandamus.

Before: HENDERSON, ROGERS and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Abd al-Rahim Hussein Muhammed al-Nashiri (Nashiri) is a detainee at Guantanamo Bay, Cuba, who is currently being tried by military commission. He asks this Court to resolve, via mandamus, two challenges to the constitutionality of the United States Court of Military Commission Review (CMCR). Our answer is simple: Not now. Because Nashiri can adequately raise his constitutional challenges on appeal from final judgment, we deny his petition.

**I.**

**A.**

The current structure of the military commissions operating at Guantanamo Bay is the product of an extended dialogue among the President, the Congress and the Supreme Court. *See generally Bahlul v. United States*, 767 F.3d 1, 12–15 (D.C. Cir. 2014) (*en banc*); *Aamer v. Obama*, 742 F.3d 1023, 1028–30 (D.C. Cir. 2014). We briefly summarize that back-and-forth here.

Immediately following the attacks of September 11, 2001, the Congress enacted an Authorization for Use of Military Force (AUMF), empowering the President to use "all necessary and appropriate force" against the perpetrators. *See* Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001). President George W. Bush relied on the AUMF to capture, detain and ultimately try enemy combatants by military commission at Guantanamo Bay. *See* Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001). In *Hamdan v. Rumsfeld*, however, the Supreme Court held that the military commissions failed to comply with the procedural protections of the Uniform Code of Military Justice (UCMJ) and Geneva Conventions. *See* 548 U.S. 557, 567 (2006). But

because those protections were creatures of *statute*, several Justices noted that the Congress was free to amend them. *See id.* at 653 (Kennedy, J., joined by Souter, Ginsburg, Breyer, JJ., concurring).

The Congress responded with the Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-366, 120 Stat. 2600, 2739–44. The 2006 MCA sanctioned the use of military commissions, 10 U.S.C. § 948b(b), and largely exempted them from the strictures of the UCMJ and Geneva Conventions, *see id.* § 948b(c)–(d); 120 Stat. at 2602. The 2006 MCA also directed the Secretary of Defense to establish the CMCR, 120 Stat. at 2621—an intermediate appellate tribunal for military commissions akin to each military branch's Court of Criminal Appeals (CCA) for courts martial, *see* 10 U.S.C. § 866. But whereas the decisions of the CCAs are reviewed by another military court—the Court of Appeals for the Armed Forces (CAAF), *id.* § 867—the CMCR's decisions are reviewed by this Court, *id.* § 950g.[1]

---

[1] Our review provision states, in relevant part:

> **(a) Exclusive appellate jurisdiction.** – Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review) under this chapter.
>
> **(b) Exhaustion of other appeals.** – The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment described in subsection (a) until all other appeals under this chapter have been waived or exhausted. . . .

The lay of the land shifted again in 2009.  On assuming office, President Barack Obama temporarily suspended the operations of the Guantanamo Bay military commissions. *See* Exec. Order No. 13,492, 74 Fed. Reg. 4897, 4899 (Jan. 22, 2009).  After further review, however, the President sought to reform the military commissions instead of dismantling them. *See* JENNIFER K. ELSEA, CONG. RESEARCH SERV., R 41163, THE MILITARY COMMISSIONS ACT OF 2009 (MCA 2009): OVERVIEW AND LEGAL ISSUES 3 (2014).  The Congress obliged and enacted the Military Commissions Act of 2009 (2009 MCA), Pub L. No. 111-84, 123 Stat. 2190, 2574–614.  The 2009 MCA added several procedural protections for enemy combatants. *See generally* ELSEA, *supra*, at 40–55 chart 2.  It also expanded the availability of appellate review.  Under the 2006 MCA, the CMCR and this Court could review military-commission judgments only on "matters of law."  120 Stat. at 2621, 2622.  Pursuant to the 2009 MCA, the CMCR can now review "any matter"—fact or law—and even "weigh the evidence" and "judge the credibility of witnesses."  10 U.S.C. § 950f(c)–(d).[2]  This Court then reviews the CMCR's decisions on "matters of law,

---

> **(d) Scope and nature of review.** – The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

10 U.S.C. § 950g(a)–(b), (d).

[2] When the Government takes an *interlocutory* appeal, however, the CMCR can act "only with respect to matters of law." 10 U.S.C. § 950d(g).

including the sufficiency of the evidence to support the verdict." 10 U.S.C. § 950g(d).

Most importantly here, the 2009 MCA altered the structure of the CMCR. The CMCR is now a "court of record" composed of both civilian and military judges. *Id.* § 950f(a)–(b). Civilian judges are appointed to the CMCR by the President with the advice and consent of the Senate. *Id.* § 950f(b)(3). Military judges are "assigned" by the Secretary of Defense but they must already be "commissioned" military officers. *Id.* § 950f(b)(2). Further, military judges cannot be removed from the CMCR absent "good cause" or "military necessity." *See id.* § 949b(b)(4). As of today, two civilian judges and eight military judges are serving on the CMCR. *See Judges U.S. Court of Military Commissions Review*, OFFICE OF MILITARY COMMISSIONS, http://www.mc.mil/ ABOUTUS/USCMCRJudges.aspx (last visited May 19, 2015). They generally sit in panels of three. *See* 10 U.S.C. § 950f(a); *Promulgation of Panel Assignments*, USCMCR (July 1, 2014), http://www.mc.mil/Portals/0/Panel%20Assign ments%20July%201%202014.pdf.

**B.**

Nashiri is a Saudi national and an alleged member of al Qaeda. According to the prosecution, Nashiri is the mastermind behind the bombings of the U.S.S. *Cole* and the M/V *Limburg*, and the attempted bombing of the U.S.S. *The Sullivans*. He was apprehended in Dubai in 2002 and transferred to Guantanamo Bay in 2006. Nashiri is charged with nine offenses, including terrorism, murder in violation of the law of war, attacking civilians, hijacking a vessel and attacking civilian objects. In 2011, the Defense Department convened a military commission to try Nashiri on these charges. It is seeking the death penalty.

In August 2014, Nashiri's military trial judge dismissed the charges and specifications stemming from the M/V *Limburg* bombing. The Government immediately appealed that ruling to the CMCR. *See* 10 U.S.C. § 950d(a)(1) (authorizing Government to take interlocutory appeal when military judge "terminates proceedings . . . with respect to a charge or specification"). Two military judges and one civilian judge were assigned to hear the Government's interlocutory appeal. In September 2014, Nashiri moved to recuse the two military judges. He alleged that military judges are assigned to the CMCR in violation of the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, and cannot be freely removed in violation of the Commander-in-Chief Clause, *id.* cl. 1. The CMCR denied Nashiri's motion in October 2014 and, one week later, Nashiri filed the petition now before us. He asks this Court to issue a writ of mandamus and prohibition[3] disqualifying the military judges on his CMCR panel.

**II.**

This case requires us to address the two "P's" of mandamus: our *power* to issue the writ and whether issuance would be *proper*. For the reasons set out below, we conclude that we have jurisdiction to issue the writ but it would be inappropriate to do so here.

---

[3] For convenience, we refer to mandamus and prohibition collectively as "mandamus." *See In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1063 n.4 (D.C. Cir. 1998) ("Because the grounds for issuing the writs are virtually identical, . . . and because 'mandamus' is the more familiar term, we prefer to use it." (citation and quotation marks omitted)).

## 7

## A.

We first address our jurisdiction. *See In re Asemani*, 455 F.3d 296, 299 (D.C. Cir. 2006) ("Before considering whether mandamus relief is appropriate, . . . we must be certain of our jurisdiction."). The All Writs Act allows us to issue "all writs necessary or appropriate in aid of [our] jurisdiction[]." 28 U.S.C. § 1651(a). It is not, however, "an independent grant of appellate jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999) (quoting 16 WRIGHT & MILLER § 3932 (2d ed. 1996)). In other words, there must be an "independent" statute that grants us jurisdiction before mandamus can be said to "aid" it. *Id.* at 534–35. We have such a statute here: the 2009 MCA gives this Court "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission." 10 U.S.C. § 950g(a). Accordingly, we can issue a writ of mandamus *now* to protect the exercise of our appellate jurisdiction *later*. *See In re Tennant*, 359 F.3d 523, 529 (D.C. Cir. 2004) (for purpose of mandamus, "[o]nce there has been a proceeding of *some* kind . . . that *might* lead to an appeal, it makes sense to speak of the matter as being 'within [our] appellate jurisdiction'—however prospective or potential that jurisdiction might be." (first alteration and second emphasis added)); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943) ("[An appellate court's mandamus jurisdiction] extends to those cases which are within its appellate jurisdiction although no appeal has been perfected. Otherwise the appellate jurisdiction could be defeated . . . by unauthorized action of the district court obstructing the appeal."). The finality requirement of the 2009 MCA, 10 U.S.C. § 950g(a), is not to the contrary because mandamus is understood to be an "exception[]" to the ordinary rules of finality. *WMATC v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 8 & n.6 (D.C. Cir. 2015); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009).

Of course, when it comes to jurisdiction, the Congress giveth and the Congress taketh away. *See Estep v. United States*, 327 U.S. 114, 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."). The 2006 MCA contains a jurisdiction-stripping provision that states:

> **(e)(1)** No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> **(2)** . . . [N]o court, justice, or judge shall have jurisdiction to hear or consider *any other action* against the United States or its agents relating to any aspect of the detention, transfer, treatment, *trial*, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e) (emphases added).[4] The Government believes that section 2241(e)(2) revokes our power to issue writs of mandamus. We disagree.

---

[4] In *Boumediene v. Bush*, the Supreme Court held that subsection (1) of the 2006 MCA's jurisdiction-stripping provision constituted an unconstitutional suspension of the writ of habeas corpus. *See* 553 U.S. 723, 733 (2008). Subsection (2), however,

A statute does not strip our authority under the All Writs Act absent a "clear[]" statement to that effect. *Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008) (citing *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); *FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966); *Scripps–Howard Radio v. FCC*, 316 U.S. 4, 11 (1942)). The clear-statement rule is a species of the constitutional avoidance doctrine: if the Congress stripped our power to issue writs of mandamus, some constitutional violations would escape review altogether. *See id.* at 458–59. This would present a "serious constitutional question"—one we should avoid, if possible. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

In *Belbacha*, we held that section 2241(e)(2) "does not displace [our] remedial authority, pursuant to the All Writs Act, to issue an auxiliary writ in aid of [our] jurisdiction." 520 F.3d at 458 (quotation marks omitted). It does not satisfy the clear-statement rule, we reasoned, because it fails to expressly include our "remedial powers." *Id.* at 458 n.\*. Although *Belbacha* deals with our authority to issue a preliminary injunction, its holding governs this case as well. The text of section 2241(e)(2) makes no mention of "mandamus"—an important omission under our case law. In *Ganem v. Heckler*, for example, we considered whether the following provision stripped the district court's mandamus power:

> No action against the United States, the Board, or any officer or employee thereof shall be brought under [the statutory grants of jurisdiction to the district courts] to recover on any claim arising under this title.

remains in force. *See Janko v. Gates*, 741 F.3d 136, 140 n.3 (D.C. Cir. 2014), *cert. denied*, 135 S. Ct. 1530 (2015).

746 F.2d 844, 850–51 (D.C. Cir. 1984) (quoting Social Security Act Amendments of 1939, Pub. L. No. 76–379, § 205(h), 53 Stat. 1360, 1371 (1939)). We compared the provision to the language of another statute that declared:

> [N]o other official or any court of the United States shall have power or jurisdiction to review any . . . decision [of the Veterans' Administration] by an action *in the nature of mandamus* or otherwise.

*Id.* at 851–52 (quoting Pub. L. No. 91-376, § 8, 84 Stat. 787, 790 (1970)) (emphasis in original). Comparing the two statutes, we concluded that "when Congress desire[s] to prohibit actions in the nature of mandamus . . . , it d[oes] so expressly." *Id.* at 851; *see also id.* at 852 ("The fact that Congress knows how to withdraw a particular remedy and has not expressly done so is some indication of a congressional intent to preserve that remedy."). The same reasoning applies here: the text of section 2241(e)(2) bears little resemblance to statutes that expressly strip mandamus jurisdiction.[5] And the Government has not identified a reference to mandamus in the legislative history of the 2006 MCA, "even assuming

---

[5] *See, e.g.*, 5 U.S.C. § 8128(b)(2) ("The action of the Secretary [of Labor] or his designee in allowing or denying a payment under this subchapter is . . . not subject to review . . . by a court *by mandamus* or otherwise." (emphasis added)); 38 U.S.C. § 511(a) ("[T]he decision of the Secretary [of Veterans Affairs] as to any such question shall be final and conclusive and may not be reviewed . . . by any court, whether by an action *in the nature of mandamus* or otherwise." (emphasis added)); 42 U.S.C. § 1715 ("The action of the Secretary [of Labor] in allowing or denying any payment under subchapter I of this chapter shall be final and conclusive on all questions of law and fact and not subject to review by any other official of the United States or by any court *by mandamus* or otherwise." (emphasis added)).

legislative history alone could provide a clear statement (which we doubt)." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015).

In short, statutory silence does not equate to a clear statement. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1660 (2011); *see also Dean Foods*, 384 U.S. at 608 (courts maintain All Writs Act authority "[i]n the absence of *explicit* direction from Congress" (emphasis added)). We therefore conclude that, notwithstanding section 2241(e)(2), this Court has jurisdiction to issue a writ of mandamus in aid of our appellate jurisdiction of military commissions and the CMCR.

We are nonetheless mindful of the final-judgment rule that the Congress included in the 2009 MCA. *See* 10 U.S.C. § 950g(a). Although it does not defeat our jurisdiction, the rule serves an important purpose that would be undermined if we did not faithfully enforce the traditional prerequisites for mandamus relief. *See Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976) ("A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies sought to be furthered by th[e] judgment of Congress" that "appellate review should be postponed until after final judgment." (ellipsis omitted)); *In re Papandreou*, 139 F.3d 247, 250 (D.C. Cir. 1998) ("Lax rules on mandamus would undercut the general rule that courts of appeals have jurisdiction only over final decisions . . . and would lead to piecemeal appellate litigation." (quotation marks and citation omitted)). We turn to those prerequisites now.

**B.**

Mandamus is proper only if three conditions are satisfied:

First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires . . . .  Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable.  Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380–81 (2004) (citations, brackets and quotation marks omitted).  We conclude that Nashiri does not satisfy the first and second requirements.

**1.**

As we often caution, "[m]andamus is a 'drastic' remedy, 'to be invoked only in extraordinary circumstances.' " *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). It is not available unless "no adequate alternative remedy exists." *Barnhart v. Devine*, 771 F.2d 1515, 1524 (D.C. Cir. 1985).  Otherwise, the writ could "be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81. Chief Justice Waite summed it up well: "The general principle which governs proceedings by *mandamus* is, that whatever can be done without the employment of that extraordinary remedy, may not be done with it." *Ex parte Rowland*, 104 U.S. 604, 617 (1881).

Mandamus is inappropriate in the presence of an obvious means of review: direct appeal from final judgment. *See*

*Roche*, 319 U.S. at 27–28 ("Ordinarily mandamus may not be resorted to as a mode of review where a statutory method of appeal has been prescribed or to review an appealable decision of record."); *Nat'l Right to Work Legal Def. v. Richey*, 510 F.2d 1239, 1242 (D.C. Cir. 1975) (mandamus unavailable when "review of the . . . question will be fully available on appeal from a final judgment"); *see also Goldsmith*, 526 U.S. at 537 & n.11 (suggesting that CAAF could not issue mandamus due to availability of ordinary direct appeal). Here, for instance, the 2009 MCA empowers this Court to review all "matters of law" once a military commission issues a final judgment and both the convening authority and the CMCR review it. *See* 10 U.S.C. § 950g(a), (d). The Government "acknowledge[s]" that this provision will allow us to consider Nashiri's constitutional challenges on direct appeal. Oral Arg. Recording 29:37–30:24; *see also id.* at 19:58–21:10; Resp't's Br. 13. Given the availability of ordinary appellate review, Nashiri must identify some "irreparable" injury that will go unredressed if he does not secure mandamus relief. *Banks v. Office of Senate Sergeant-At-Arms & Doorkeeper of U.S. Senate*, 471 F.3d 1341, 1350 (D.C. Cir. 2006); *Nat'l Ass'n of Criminal Def. Lawyers, Inc. v. DOJ (NACDL)*, 182 F.3d 981, 987 (D.C. Cir. 1999). He makes two attempts to do so. Both fail.

First, Nashiri draws an analogy to judicial disqualification, pointing out that this Court has entertained mandamus petitions when a judicial officer declines to recuse himself. *See, e.g.*, *In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006); *In re Brooks*, 383 F.3d 1036, 1041 (D.C. Cir. 2004); *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003). But Nashiri misses the "irreparable" injury that justified mandamus in those cases: the existence of actual or apparent *bias*. *Cobell*, 334 F.3d 1139. With actual bias, ordinary appellate review is insufficient because it is too

difficult to detect all of the ways that bias can influence a proceeding. *See id.* ("[I]f prejudice exist[ed], it has worked its evil and a judgment of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or decision than a disposition of a mind in which there is a personal ingredient." (quoting *Berger v. United States*, 255 U.S. 22, 36 (1921)). With apparent bias, ordinary appellate review fails to restore "public confidence in the integrity of the judicial process," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988)—confidence that is irreparably dampened once "a case is allowed to proceed before a judge who appears to be tainted." *In re Sch. Asbestos Litig.*, 977 F.2d 764, 776 (3d Cir. 1992); *accord In re United States*, 666 F.2d 690, 694 (1st Cir. 1981) ("Public confidence in the courts requires that [bias] question[s] be disposed of at the earliest possible opportunity." (alterations omitted)). Nashiri does not allege that the military judges on the CMCR are biased against him—in fact or apparently. And our recusal cases do not support his petition. *See Cobell*, 334 F.3d at 1139 ("A case involving a motion for disqualification is clearly distinguishable from those where a party alleges an error of law that may be fully addressed and remedied on appeal." (quoting *In re United States*, 666 F.2d at 694 (ellipsis omitted))).

Nashiri reads our precedent differently. He contends that, in addition to bias, our recusal cases recognize another form of irreparable injury: a violation of the separation of powers. He cites *Cobell*, 334 F.3d at 1141, for this proposition. Yet, apart from bias, the irreparable injury we identified in *Cobell* was not an abstract concern with the separation of powers but rather the risk of "interference with the internal deliberations of a Department of the Government of the United States." *Id.* at 1140–43. There, a court monitor

was attending internal Department of Interior (DOI) meetings and interfering with the agency's ability to comply with a court order. *See id.* at 1134–35, 1141–43. We put a stop to it, via mandamus, because "the Court Monitor's duties were so wide-ranging as to have a potentially significant effect upon the DOI's deliberative process." *Id.* at 1145 n.\*. Nashiri has identified no such immediate or ongoing harm from the CMCR's alleged constitutional defects. *See United States v. Cisneros*, 169 F.3d 763, 769 (D.C. Cir. 1999) ("Most separation-of-powers claims are clearly not in th[e] category [of] . . . a right not to be tried."). His purported injury— *conviction* of one of the charged offenses—has yet to occur. Indeed, his separation-of-powers claims are, at bottom, a challenge to the constitutionality of a provision of the 2009 MCA. *See* Pet'r's Br. 23 (asking this Court "to strike down 10 U.S.C. § 950f(b)(2)"). As we held in *Cisneros*, such claims are "fully reviewable on appeal should the defendant be convicted." 169 F.3d at 769; *see also id.* at 770–71 ("[I]f there is merit to [the defendant's] claim about . . . infringement on the President's (and the Senate's) [constitutional authority], . . . there will be time enough in an appeal from the final judgment to vindicate the separation of powers.").[6] Specifically, if Nashiri is convicted, the

---

[6] *Cisneros* was technically a case about the collateral-order doctrine, not mandamus. *See* 169 F.3d at 767. Nevertheless, it is directly relevant here because the decision turned on the "effectively unreviewable on appeal" requirement of the collateral-order doctrine, *id.* at 767–68 (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)), which is functionally identical to the no-other-adequate-means requirement of mandamus. *See Papandreou*, 139 F.3d at 250 ("[M]andamus's 'no other adequate means' requirement tracks [the collateral order doctrine's] bar on issues effectively reviewable on ordinary appeal."); *see also Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 730 (D.C. Cir.

convening authority and the CMCR affirm that conviction, Nashiri appeals to this Court and convinces us his constitutional arguments are correct, we can then vacate the CMCR's decision. *See Ryder v. United States*, 515 U.S. 177, 187–88 (1995) (explaining that, on final-judgment review, CAAF should vacate CCA decision if its judges were appointed in violation of Appointments Clause). Vacatur, even at the appeal-from-final-judgment stage, would fully vindicate Nashiri's "right[s]" and "the President's [and] the Senate's constitutional powers." *Cisneros*, 169 F.3d at 769; *see also Van Cauwenberghe v. Biard*, 486 U.S. 517, 527 (1988) ("the right not to be subject to a binding judgment may be effectively vindicated following final judgment").

Second, Nashiri contends that, absent mandamus relief, he will suffer irreparable injury in the form of "the sui generis harms associated with defending against capital charges." Pet'r's Br. 13 (quotation marks omitted). He, in effect, wants us to create a "death penalty" exception to the traditional rules of mandamus. We decline the invitation. Such an exception would contradict the bedrock principle of mandamus jurisprudence that the burdens of litigation are normally not a sufficient basis for issuing the writ. *See Parr v. United States*, 351 U.S. 513, 519–20 (1956) (finality requirements assume "the [defendant] will have to hazard a trial . . . before he can get a review" and "bear[] the discomfiture and cost of a prosecution"); *Roche*, 319 U.S. at 30 ("[A criminal t]rial may be of several months' duration and may be correspondingly costly and inconvenient. But that inconvenience is one which we must take it Congress contemplated in providing that only final judgments should be reviewable."); *see also Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953)

2012) ("This court has acknowledged the similarities between the requirements for mandamus and collateral order review.").

("[E]xtraordinary writs cannot be used as substitutes for appeals, even though hardship may result from delay and perhaps unnecessary trial." (citations omitted)).

Granted, in *United States v. Harper*, the Ninth Circuit relied on the "substantial hardship" of a capital trial to support its decision to issue a writ of mandamus. 729 F.2d 1216, 1222–23 (9th Cir. 1984). But the constitutionality of the death penalty was the *subject* of the mandamus petition in that case. Specifically, the *Harper* court used mandamus to strike down the death-penalty provision of the Espionage Act. *See id.* at 1226. Here, however, Nashiri challenges the composition of an intermediate appellate tribunal. We fail to see how granting his petition would spare him the burdens of capital prosecution. Even if the military judges were disqualified and an all-civilian panel of the CMCR affirmed the dismissal of the M/V *Limburg* charges, Nashiri has yet to even begin defending against the capital charges stemming from the bombing of the U.S.S. *Cole* and the attempted bombing of the U.S.S. *The Sullivans*. Thus, capital prosecution is inevitable for Nashiri, with or without mandamus. *Harper* is therefore inapposite.

Finally, Nashiri contends that, even absent irreparable harm, we should exercise our mandamus power to resolve the constitutional status of military judges on the CMCR—a pure question of law that could affect many cases. In other words, he wants us to use the writ in an "advisory" capacity. *See generally* 16 WRIGHT & MILLER § 3934.1. Whatever the continued legitimacy of advisory mandamus, *see First Nat'l Bank of Waukesha v. Warren*, 796 F.2d 999, 1004 (7th Cir. 1986) ("Although the [Supreme] Court has not yet erected the tombstone, it has ordered flowers."), our past willingness to use the writ in that capacity "cannot be read expansively." *United States v. Hubbard*, 650 F.2d 293, 309–10 n.62 (D.C.

Cir. 1980); *see also Banks*, 471 F.3d at 1350 ("So reluctant are we to consider [advisory] mandamus relief that even where we have been presented really extraordinary cases, we are careful to caution against indiscriminate mandamus review." (quotation marks omitted)).  Even if we were willing, we are *unable* to use advisory mandamus here because it would circumvent the no-other-adequate-means requirement.  *See Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 198 (D.C. Cir. 2002) ("[N]o writ of mandamus—whether denominated 'advisory,' 'supervisory,' or otherwise—will issue unless the petitioner shows . . . that [he] has no other adequate means of redress."); *see also NACDL*, 182 F.3d at 987 ("In no event . . . could clear error alone support the issuance of a writ of mandamus" when the error "could be corrected on appeal without irreparable harm").

Additionally, the use of advisory mandamus in this case would conflict with the constitutional avoidance doctrine, a "time-honored practice of judicial restraint."  *Cisneros*, 169 F.3d at 768.  Nashiri's petition presents two constitutional questions of first impression and "[c]ourts do not reach out to decide such questions."  *Pub. Citizen Health Research Grp. v. Tyson*, 796 F.2d 1479, 1507 (D.C. Cir. 1986).  Because Nashiri may ultimately be acquitted of the charged offenses, we may never need to resolve his constitutional challenges to the 2009 MCA.  We should plainly not enter the fray now. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

To recap, we hold that Nashiri is not entitled to mandamus relief because this Court can consider his

Appointments Clause and Commander-in-Chief Clause challenges on direct appeal, after the military commission renders a final judgment and the convening authority and the CMCR review it.

**2.**

Nor can Nashiri demonstrate a "clear and indisputable" right to the writ. *Cheney*, 542 U.S. at 381. Given its "exceptional" nature, we cannot use mandamus to remedy anything less than a "clear abuse of discretion or usurpation of judicial power." *Bankers Life*, 346 U.S. at 383 (quotation mark omitted). Otherwise, "every interlocutory order which is wrong might be reviewed under the All Writs Act" and "[t]he office of a writ of mandamus would be enlarged to actually control the decision of the trial court rather than used in its traditional function of confining a court to its prescribed jurisdiction." *Id.*

With these principles in mind, only Nashiri's Appointments Clause challenge gives us pause. The Clause requires "all . . . Officers of the United States" to be appointed by the President "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2. This requirement is subject to an Excepting Clause that allows the Congress to vest the appointment of "inferior" officers in "the Heads of Departments." *Id.* As noted *supra*, military judges are "assigned" to the CMCR by the Secretary of Defense, 10 U.S.C. § 950f(b)(2)—the "Head[]" of the Department of Defense, *see Burnap v. United States*, 252 U.S. 512, 515 (1920) ("The term 'head of a department' means . . . the Secretary in charge of a great division of the executive branch of the government, like the State, Treasury, and War, who is a member of the Cabinet."). Nashiri argues, however, that CMCR judges are "principal," rather than "inferior," officers

and are therefore ineligible for the Excepting Clause. *See Morrison v. Olson*, 487 U.S. 654, 670–71 (1988).

This Court has not addressed whether CMCR judges are principal or inferior officers. In *Edmond v. United States*, 520 U.S. 651 (1997), the Supreme Court considered a close analog: the judges who serve on the CCAs. The *Edmond* Court acknowledged that CCA judges enjoy extended tenure, have broad jurisdiction and "exercis[e] significant authority on behalf of the United States." *Id.* at 661–62. It nevertheless concluded that CCA judges are *inferior* officers because their work is extensively supervised. *See id.* at 666. According to the Court:

> Generally speaking, the term "inferior officer" connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a superior. . . . "[I]nferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

*Id.* at 662–63. CCA judges are supervised by two entities: the Judge Advocates General and the CAAF. *Id.* at 664. The Judge Advocates General "prescribe uniform rules of procedure" for the CCAs; "meet periodically . . . to formulate policies and procedure in regard to review of court-martial cases"; and "may . . . remove a [CCA] judge from his judicial assignment without cause" so long as the removal is not motivated by an "attempt to influence . . . the outcome of individual proceedings." *Id.* The CAAF reviews the decisions of the CCAs and can reverse them for errors of law. *Id.* at 664–65 (citing 10 U.S.C. § 867).

CMCR judges are similar to CCA judges in several respects—a similarity the Congress no doubt intended, *see* 10 U.S.C. § 948b(c) ("The procedures for military commissions set forth in this chapter are based upon the procedures for trial by general courts-martial . . . ."). For example, like the Judge Advocates General, the Secretary of Defense supervises the CMCR by promulgating its procedures, *id.* § 950f(c), and he can also remove its military judges, *id.* § 949b(b)(4). Further, this Court reviews the CMCR's decisions under a review provision virtually identical to the CAAF's. *See id.* § 867(c). The judges of this Court are, of course, "appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.

Despite these similarities, however, there are key differences between CMCR judges and their CCA counterparts. While the Judge Advocates General can remove CCA judges without cause, the Defense Secretary can remove military judges from the CMCR for "good cause" or "military necessity" only. 10 U.S.C. § 949b(b)(4). Because removal is "a powerful tool for control," *Edmond*, 520 U.S. at 664, the added insulation of CMCR judges is constitutionally significant. Additionally, the Supreme Court made a point in *Edmond* to emphasize that the CAAF is "another *Executive Branch* entity." *Id.* at 664 & n.2 (emphasis added). The CMCR's decisions, by contrast, "are appealable only to [a] court[] of the Third Branch," *id.* at 666—namely, this Court. 10 U.S.C. § 950g(a).

The key question, then, is whether the CMCR's variation on the CCA model converts its military judges from inferior to principal officers. We faced a similar issue in *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012). There, we considered an Appointments Clause challenge to the Copyright Royalty

Judges (CRJs). The Copyright Royalty Board (Board) sets the terms and conditions of copyright licensing agreements by conducting ratemaking proceedings. *See id.* at 1334–35. CRJs are appointed by the Librarian of Congress, 17 U.S.C. § 801(a), and can be removed for misconduct or neglect of duty, *see id.* § 802(i). The Board's rate determinations are reviewed by this Court. *Id.* § 803(d)(1). We concluded in *Intercollegiate* that CRJs are *principal* officers. *See* 684 F.3d at 1340. The CRJs' for-cause removal protection is not "generally consistent with the status of an inferior officer." *Id.* And the fact that the Board's rate determinations are reviewed by this Court rather than by an Executive Branch body means that "CRJs issue decisions that are final for the executive branch." *Id.* Although the Librarian "approv[es] the CRJs' procedural regulations," *id.* at 1338 (citing 17 U.S.C. § 803(b)(6)), this limited supervision does not render the CRJs inferior officers because the Librarian does not "play an influential role in the[ir] substantive decisions." *Id.*

Still, CMCR military judges are not entirely like the CRJs in *Intercollegiate*. Most significantly, the Defense Secretary has broader authority to remove military judges from the CMCR than the Librarian of Congress has vis-à-vis the CRJs. The Secretary can remove a military judge either for good cause *or* "military necessity." 10 U.S.C. § 949b(b)(4). This additional removal authority is non-trivial; we would likely give the Executive Branch substantial discretion to determine what constitutes military necessity. *Cf. Martin v. Mott*, 25 U.S. 19, 29–30 (1827) ("[T]he authority to decide whether [an] exigency [justifying the exercise of military power] has arisen, belongs exclusively to the President, and . . . his decision is conclusive upon all other persons."); *see also Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953) ("[J]udges are not given the task of running the Army

. . . . [W]e have found no case where this Court has assumed to revise duty orders as to one lawfully in the service.").

In short, neither the CCAs (*Edmond*) nor the Copyright Royalty Board (*Intercollegiate*) is a perfect analog of the CMCR. This is unsurprising, as "[t]he line between 'inferior' and 'principal' officers" is "far from clear" and highly contextual. *Morrison*, 487 U.S. at 671. More importantly, even if we agreed with Nashiri that military CMCR judges are principal officers, our analysis could not end there. As mentioned earlier, the Defense Secretary can assign only "commissioned" military officers to the CMCR. 10 U.S.C. § 950f(b)(2). To become a commissioned military officer, an individual must be nominated by the President with the advice and consent of the Senate, *id.* § 531(a)[7]—precisely the procedure contemplated by the Appointments Clause. The question, then, is whether the Constitution requires commissioned military officers to obtain an *additional* appointment before they can serve on the CMCR.

The Supreme Court answered this question in the negative in *Weiss v. United States*, 510 U.S. 163 (1994). That

---

[7] To be specific, only high-ranking commissioned military officers are President-nominated and Senate-confirmed. *See* 10 U.S.C. § 531(a)(2). The President alone can appoint officers to the grades of second lieutenant, first lieutenant and captain (or, in naval terminology, ensign, lieutenant (junior grade) and lieutenant). *Id.* § 531(a)(1). The military judges on Nashiri's CMCR panel—Colonel Eric Krauss, USA, and Lieutenant Colonel Jeremy S. Weber, USAF—are both high-ranking officers who were nominated by the President and confirmed by the Senate. *See* 157 Cong. Rec. S7389–90 (daily ed. Nov. 10, 2011) (Krauss); 160 Cong. Rec. S5311 (daily ed. July 31, 2014) (Weber).

case involved CCA[8] judges—who, like CMCR judges, are assigned to their respective courts but must already be commissioned military officers. 10 U.S.C. § 866(a). According to *Weiss*, CCA judges need no additional appointment for two reasons. First, the Court found no evidence that the Congress was trying to circumvent the Appointments Clause by allowing CCA judges to be assigned without a second appointment. *See* 510 U.S. at 173–74. The Congress neither attempted to add responsibilities to an existing office, *id.* at 174 (distinguishing *Shoemaker v. United States*, 147 U.S. 282, 300–01 (1893)), nor tried to "diffus[e]" the appointment power, *id.* Second, the duties of commissioned military officers are "germane" to the duties of military judges. *See id.* at 174–76. As the Court explained, "all military officers . . . play a role in the operation of the military justice system" by disciplining subordinates, serving on courts martial and reviewing court-martial sentences. *Id.* at 175. For these reasons, the Court unanimously held that commissioned military officers can serve as CCA judges without an additional appointment. *Id.* at 176.

*Weiss* is more complicated, however, than the Court's unanimity might ordinarily suggest. Notably, the Court declined to *hold* that "germaneness" is required by the Appointments Clause; instead, it "assume[d], *arguendo*, that the principle of 'germaneness' applies." *Id.* at 174. Justice Scalia, joined by Justice Thomas, wrote separately to explain why they believe germaneness *is* constitutionally required.

---

[8] When *Weiss* was decided, the CCAs were the "Courts of Military Review" and the CAAF was the "Court of Military Appeals." The Congress renamed these courts in 1995. *See* National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, § 924, 108 Stat. 2663, 2831. For clarity, we use their current names.

*See id.* at 196 (Scalia, J., concurring in part and concurring in judgment) ("[T]aking on . . . nongermane duties . . . would amount to assuming a new 'Offic[e]' within the meaning of Article II, and the appointment to that office would have to comply with the strictures of Article II."). But the majority opinion found it unnecessary to decide that question.

Additionally, Justice Souter wrote separately to explain why he thinks CCA judges are "inferior officers" under the Appointments Clause. *Id.* at 182 (Souter, J., concurring). Their inferior-officer status was important to Justice Souter because it meant that the assignment of commissioned military officers to the CCAs was inferior-to-inferior, not inferior-to-*principal*. *Id.* at 190. For Justice Souter, an inferior-to-principal assignment—without a second Presidential nomination and Senate confirmation—"would raise a serious Appointments Clause problem," *id.* at 191, because inferior-to-principal assignments would amount to an "abdication" of both the President's and the Senate's contemplated roles under the Appointments Clause. *Id.* at 189. According to Justice Souter, "[i]t cannot seriously be contended that in confirming the literally tens of thousands of military officers each year the Senate would, or even could, adequately focus on the remote possibility that a small number of them would eventually serve as military judges." *Id.* at 190–91. Justices Scalia and Thomas, for their part, noted that the issues presented by inferior-to-principal assignments are "complex." *See id.* at 196 n.* (Scalia, J., concurring).

Nevertheless, the majority opinion in *Weiss* did not discuss whether military judges are principal officers. Nor did the Court suggest that the inferior-versus-principal distinction played a role in its constitutional analysis. But neither did *Weiss* hold that an inferior-to-principal assignment

without a separate appointment is *permissible*. After *Edmond*, we know that CCA judges are inferior officers and, thus, *Weiss* dealt only with an inferior-to-inferior assignment. *See Edmond*, 520 U.S. at 666.

\* \* \* \*

As the foregoing discussion demonstrates, Nashiri's Appointments Clause challenge raises several questions of first impression. Are CMCR military judges principal or inferior officers? If they are principal officers, does their initial appointment to be commissioned military officers satisfy the Appointments Clause? Likewise, what role, if any, does "germaneness" play in the constitutional analysis? Does the Appointments Clause require germaneness for inferior-to-inferior assignments? If not, would germaneness nonetheless *cure* any Appointments Clause question with an inferior-to-principal assignment? Are the duties of a CMCR military judge germane to the duties of a commissioned military officer? These are but a few of the questions we would confront if we followed Nashiri down the rabbit hole.

We do not resolve these open questions today. What matters for Nashiri's petition is that they are just that—open. Legal aporias are the antithesis of the "clear and indisputable" right needed for mandamus relief. *See NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013) (right to mandamus not clear and indisputable in absence of "bind[ing]" precedent); *Republic of Venezuela*, 287 F.3d at 199 (petitioners did "not come close" to showing clear and indisputable right because they "identif[ied] no precedent of this court or of the Supreme Court" on point). Even if we ultimately agreed with Nashiri on the merits, mandamus would not lie because the answer was hardly "clear" *ex ante*. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762 (D.C. Cir. 2014) ("An erroneous

district court ruling on an . . . issue by itself does not justify mandamus. The error has to be clear.").

There may be another reason to pump our judicial brakes. Once this opinion issues, the President and the Senate could decide to put to rest any Appointments Clause questions regarding the CMCR's military judges. They could do so by re-nominating and re-confirming the military judges to be *CMCR judges*. Taking these steps—whether or not they are constitutionally required—would answer any Appointments Clause challenge to the CMCR.

For the foregoing reasons, Nashiri's petition for a writ of mandamus and prohibition is

*Denied.*